# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ALBERT NEVES,                                  :

                       Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                      Defendant.              :

Case No. 3:07-cv-144

District Judge Walter Herbert Rice
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI alleging disability from October 26, 2000, due to a back impairment. *See, e.g.,* Tr. 85-91; 111-24. Plaintiff's applications were denied initially and on reconsideration. *See, e.g.,* Tr. 42-45; 48-50. Plaintiff then filed a Request for Hearing. (Tr. 52). Administrative Law Judge Thomas McNichols held three (3) hearings, (Tr. 667-699; 700-51; 752-89), following which he determined that Plaintiff was disabled as of March 21, 2006, but not before. (Tr. 18-33). The Appeals Council denied Plaintiff's request for review, (Tr. 9-12), and Judge McNichols' decision became the Commissioner's final decision.

In determining that Plaintiff is disabled as of March 21, 2006, but not before Judge McNichols found that Plaintiff met the insured status requirements of the Act through December 21, 2006. (Tr. 23, finding 1). Judge McNichols then found that Plaintiff has severe chronic low back pain with residuals of a May, 2001, lumbar fusion, signs and symptoms of retinitis pigmentosa, depression, personality disorder, and pain disorder, but that prior to March 21, 2006, he did not have an impairment or combination of impairments that met or equaled the Listings. *Id.*, finding 3; Tr. 27, finding 4. Judge McNichols found further that prior to March 21, 2006, Plaintiff had the residual functional capacity to perform a limited range of light work. (Tr. 28, finding 5). Judge McNichols then used section 201.21 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and determined that prior to March 21, 2006, there was a significant number of jobs in the economy that Plaintiff was capable of performing. (Tr. 30, finding 10; Tr. 31). Judge McNichols then determined that beginning on March 21, 2006, Plaintiff's mental impairments, when considered in combination, has medically equaled the requirements of Listings 12.04 and 12.08. (Tr.

4

31, finding 11).  Judge McNichols concluded that Plaintiff was not disabled prior to March 21, 2006, but that he became disabled as of March 21, 2006, and therefore he was entitled to benefits under the Act as of March 21, 2006, but not before that date.  (Tr. 32, finding 12; Tr. 32-33).

A November 7, 2000, MRI of Plaintiff's lumbar spine revealed an L5-S1 left posterior paramedian disc herniation which impressed on the left S1 nerve root possibly resulting in radiculopathy.  (Tr. 239).  A November 13, 2000, CT of Plaintiff's lumbar spine revealed a bulging disc with moderate central spinal canal stenosis at L5-S1.  (Tr. 243).

On December 7, 2000, Plaintiff consulted with neurosurgeon Dr. Africk who determined that Plaintiff had sacroiliitis causing low back pain and sciatica.  (Tr. 254-55).  Dr. Africk recommended that Plaintiff undergo physical therapy, possibly undergo steroid injections into the sacroiliac joint and possible trigger point injections, and that he take prescribed medications.  *Id.*

On April 3, 2001, a diskogram of Plaintiff's lumbar spine revealed that an L5-S1 injection reproduced Plaintiff's exact low back sharp pain without radiation and annular degeneration of the L4-5 and L5-S1 level. (Tr.256-57).  An April 4, 2001, limited CT scan indicated a fairly focal right posterior lateral annular degeneration with no contrast extending to the outer annular fibers at L4-5 with no definite central or exiting nerve root compromise seen, more diffuse posterior annular degeneration with contrast to the outer annular fibers without central or exiting nerve compromise, and no annular tear identified.  (Tr. 258).

In May, 2001, Plaintiff underwent an L5-S1 anterior lumbar interbody fusion with BAK cages and an iliac crest bone graft which Drs. Kraus and Williams performed.  (Tr. 263-83).  Plaintiff tolerated the procedure well.  *Id.*

5

Examining psychologist Dr. Boerger reported on December 16, 2002, that Plaintiff graduated from high school, displayed some problems with recall of information from his history, had an appropriate affect, said that his physical condition was on his mind every day, was alert and oriented, and appeared to be aware of his health and emotional problems. (Tr. 290-95). Dr. Boerger also reported that Plaintiff displayed characteristics of depression which could be characterized as depressive disorder NOS, that there were also indications of avoidant personality traits, that it appeared it would be beneficial for him to become involved in outpatient mental health counseling, and that his GAF was 53. *Id.* Dr. Boerger opined that Plaintiff's ability to relate to others was moderately impaired, his ability to understand and follow instructions was moderately impaired, his ability to maintain attention to perform simple repetitive tasks was moderately limited, and that his ability to withstand the stress and pressures associated with day-to-day work activity was moderately to markedly impaired. *Id.*

Ophthalmologist Dr. Thomas reported on June 12, 2003, that Plaintiff complained of limited side vision as well as extremely poor night vision, that he was undergoing multiple tests and evaluation and that his working diagnosis was possible retinitis pigmentosa. (Tr. 296-99).

Examining physician Dr. Danopulos reported on July 22, 2003, that Plaintiff used a cane, he had back surgery in May, 2001, but he stated he did not benefit from the surgery, and that he complained of constant and continuous back pain with numbness in both legs. (Tr. 318-27). Dr. Danopulos also reported that Plaintiff reported his peripheral vision was distorted and he could not see in the dark, that he started experiencing left hand pain a week ago, and that he started being depressed three months after his May, 2001, surgery. *Id.* Dr. Danopulos noted that Plaintiff's upper and lower extremities revealed full ranges of motion, the dorsal side of his left hand was painful to

6

palpation, he had a normal gait, his spine was painful to pressure in its entire length and his LS spine was more painful, his paravertebral muscles were painless, bilateral straight leg raising was positive at 60 degrees bilaterally, and that there was no evidence of nerve root compression or peripheral neuropathy. *Id.* Dr. Danopulos noted further that Plaintiff's deep tendon reflexes were exaggerated in the lower extremities, his Achilles tendon reflexes were absent, the objective findings were status post lumbar discectomy with fusion triggering chronic lumbar spine pain, history of retinal pigmentosus with practically normal Snellen visual acuity with glasses with restricted peripheral vision, and circumstantial depression with anxiety neurosis. *Id.* Dr. Danopulos opined that Plaintiff's abilities to do any work-related activities like sitting, walking, lifting, and carrying were restricted by his chronic lumbar spine pain and that anxiety neurosis deteriorated his condition. *Id.*

In August, 2003, examining ophthalmologist Dr. Miller, reported that Plaintiff had no signs of retinitis pigmentosa in either eye. (Tr. 329-32).

Dr. Thomas reported in September, 2003, that Plaintiff had signs and symptoms of retinitis pigmentosa but no true retinal pigment layer. (Tr. 335-38).

Plaintiff began receiving treatment at the Miami County Mental Health Center in September 19, 2002. (Tr. 349-91). The record contains a copy of Plaintiff's treatment notes dated September, 2002, through April, 2004, and which reflect that Plaintiff saw a counselor, Ms. Zunke, as well as psychiatrist, Dr. Mahajan, and that his diagnoses were major depressive disorder single episode and moderate, nicotine dependence sustained in full remission, and alcohol abuse sustained in full remission. *Id.* On May 27, 2004, Ms. Zunke and Dr. Mahajan reported that Plaintiff's mental abilities for performing unskilled work were unlimited to limited and unsatisfactory to none, that he was in severe physical pain, was unable to sit or move without pain, could not bend or lift, that

7

his eyesight was failing, and that his restrictions existed and persisted since at least October 26, 2000. *Id.*

Treating ophthalmologist Dr. Sprowl, *see, infra.,* reported on June 4, 2004, that Plaintiff did not meet the criteria for a Social Security disorder of vision. (Tr. 440).

On September 14, 2004, Plaintiff underwent a lacrimal efficiency test of his lower lids and placement of dissolvable collagen plugs in the horizontal canaliculus of his lower lids which Dr. Ellenbogen performed. (Tr. 449).

Dr. Sprowl reported on November 11, 2004, that he had evaluated Plaintiff twice since June, 2004, that his best corrected vision was 20/400 for the right eye and 20/200 for the left eye, and that there were no signs of disc edema in either eye. *Id.*

Plaintiff continued to receive mental health treatment at the Miami County Mental Health Center during the period June 23, 2004, through September, 2005. (Tr. 418-34; 564-85). On March 30, 2005, Ms. Zunke reported that Plaintiff's abilities to perform mental activities critical to performing unskilled work were unlimited to limited but satisfactory to limited and unsatisfactory, he got a headache after about fifteen minutes of concentration, he was falling more often due to poor vision, he could no longer drive, he was in severe pain all day and all night, he spent half of the day in bed most days, and that he was irritable. *Id.* Ms. Zunke also reported that Plaintiff was not able to manage any benefits in his own best interest. *Id.*

In May, 2005, Plaintiff consulted with ophthalmologist Dr. Gould who reported that Plaintiff's visual acuity was 20/400 in the right eye, 20/80 in the left eye, his confrontational fields revealed significant constriction, his retina looked perfectly healthy, and that there was no evidence of any retinal pigment epithelial changes. (Tr. 436). Dr. Gould also reported that he did not see any

8

evidence of any bony spicule formation or any evidence of any retinal pigment epithelial changes, that Plaintiff's optic nerve looked quite healthy, and that there was no optic nerve pallor or edema. *Id.*

Also in May, 2005, Plaintiff consulted with retinal physician and surgeon Dr. Buerk who reported that his examination of Plaintiff was essentially normal. (Tr. 454).

On July 8, 2005, neuro-ophthalmologist Dr. Hartel reported that Plaintiff's corrected distance visual acuities was 2/60 -1 with each eye and that he had a clinical presentation most consistent with functional visual loss. (Tr. 466-67). At Dr. Hartel's request, Plaintiff underwent visual evoked potentials to the left and right monocular pattern-reversal stimulation which were abnormal. (Tr. 439). Dr. Hartel reported on July 22, 2005, that with the abnormal VER study, a brain CT scan would be pursued. (Tr. 462). The July 26, 2005, CT of Plaintiff's brain and orbits was normal. (Tr. 473).

A July, 2005, CT of Plaintiff's lumbar spine revealed no localized herniated disc, a bulging disc at L4-L5 without effacement of the thecal sac, mild facet atrophy, and status post intervertebral disc cage at the level of L5-S1. (Tr. 474).

Dr. Danopulos examined Plaintiff again on August 2, 2005, and he reported that the review of Plaintiff's systems was negative, his vision acuity was 20/200 in his right eye and 20/100 in his left eye with glasses, he had full ranges of motion in his upper and lower extremities, his left wrist was painful to pressure, and his left-sided thenar muscle was slightly atrophic. (Tr. 489-502). Dr Danopulos reported further that Plaintiff had a normal gait helped by a cane, that the cane was not obligatory, his spine was painful to pressure in its entire length excluding the cervical spine, the paraspinal muscles were soft and painless to palpation and pressure, and that he got on and off the

exam table without difficulty. *Id.* Dr. Danopulos noted that Plaintiff's straight leg raising was positive at 40 degrees bilaterally, he could not squat or arise from a squat, his LS spine motions were denied, he could not walk on his heels or toes, there was no evidence of nerve root compression or peripheral neuropathy, and his neurological exam was normal. *Id.* Dr. Danopulos noted further that the objective findings were rule out mild to moderate lumbar spine arthritis, retinitis pigmentosa with history of suggested bilateral retrobulbar optic neuritis with current disturbed vision, left-sided carpal tunnel syndrome mild to moderate, well-controlled blood pressure, history of hypothyroidism, suggestion of MS which was not evaluated properly, and major depression. *Id.* Dr. Danopulos opined that Plaintiff's ability to do any work-related activities like moving around was affected in a negative way from his disturbed bilateral vision which does not allow him to see and walk properly, his lumbar spine arthritis affects his walking, lifting, and carrying, his major depression had possibly intensified and should be evaluated again, and that his vision should be evaluated again. *Id.*

A September 19, 2005, brain stem auditory evoked response study was normal. (Tr. 511). On that same date, a upper extremity somatosensory evoked response study was normal. (Tr. 513).

Plaintiff underwent electrophysiological testing on October 24, 2005, and the report from that procedure indicated that light adapted and dark adapted ERGs utilizing two techniques were normal, a subtle below normal response with the maximum response which was likely due to extraneous variables such as Plaintiff's darker fundus pigmentation, and that overall the results were suggestive of normal retinal function and suggestive of a significant non-organic component to Plaintiff's vision loss. (Tr. 515-36).

10

Plaintiff consulted with neurologist Dr. Kitchener during the period August 30, 2005, through February 3, 2006. (Tr. 550-60). On February 3, 2006, Dr. Kitchener reported that Plaintiff had been evaluated for multiple sclerosis but that it was not really diagnosed. *Id.* Dr. Kitchener reported further that there was no definite radiologic or spinal fluid analysis that could support a diagnosis of multiple sclerosis in Plaintiff although he had multiple symptoms, that the only significant abnormality was an abnormal visual evoked response study suggesting impairment of the visual optic pathway and that he did have a significant visual dysfunction which may be his most disabling problem. *Id.*

On March 21, 2006, Ms. Zunke and Dr. Nims of the Miami County Mental Health Center reported that Plaintiff's mental abilities which are critical for performing unskilled work were limited but satisfactory to limited and unsatisfactory to none. (Tr. 561-63). Those mental health care providers also reported that Plaintiff's depression had gotten worse, his vision was minimal, he was in severe pain and could barely sit or walk for longer than a few minutes, his concentration was poor, and that he was easily agitated. *Id.*

Examining neuropsychologist Dr. Smith reported on June 22, 2006, that Plaintiff was alert and oriented, walked with a long red-tipped cane, evidenced significant pain behaviors, his basic sensory motor function appeared to be intact for the purpose of the evaluation, he had difficulty with tasks involving fine visual detail, and he exhibited psychomotor slowing. (Tr. 586-96). Dr. Smith also reported that Plaintiff's affect was flat, consistently made negative comments about himself and his test performance, and required multiple repetition of questions due to either distractibility or extremely slow responding. *Id.* Dr. Smith noted that Plaintiff's verbal IQ was 77, his performance IQ was 74, and his full scale IQ was 74, he read at the 8th grade level, performed

11

arithmetic at the 4th grade level, appeared to have basically intact expressive and receptive language skills, his memory function was in the impaired range, and that he was functioning in the borderline range of intellectual functioning. *Id.* Dr. Smith noted further that Plaintiff's disability index was at the extreme range, his test data indicated extreme impairment in the areas of attention, concentration, and information processing capabilities, his short-term learning and memory for new auditory verbal information was extremely impaired, and his recognition of information to which he was previously exposed was impaired. *Id.* Dr. Smith identified Plaintiff's diagnoses as major depressive disorder, recurrent and severe, and pain disorder associated with other psychological factors and medical conditions/chronic. *Id.* Dr. Smith opined that Plaintiff was not capable of performing gainful employment due to his visual problem and his cognitive and memory problems. *Id.*

Dr. Boerger again examined Plaintiff and reported on July 18, 2006, that Plaintiff appeared to have difficulty with recall of information, had a mildly irritable affect, reported some problems with anxiety, had a lot of concerns about his physical condition, was alert and oriented, and appeared to be aware of his health and emotional problems. (Tr. 597-05). Dr. Boerger also reported that Plaintiff's MMPI results suggested probable strong exaggeration of symptoms and were of doubtful validity, he displayed behavioral characteristics of irritability, negative thought pattern and chronically depressed mood, and that his behavior and test results suggested tendencies towards exaggeration of symptoms. *Id.* Dr. Boerger identified Plaintiff's diagnoses as dysthymic disorder, avoidant and passive-aggressive personality traits and he assigned Plaintiff a GAF of 53. *Id.* Dr. Boerger opined that Plaintiff's ability to relate to others was moderately to markedly impaired, and his abilities to understand and follow instructions, maintain attention to perform

12

simple repetitive tasks, and to withstand the stress and pressures associated with day-to day work activity were moderately impaired. *Id.*

Plaintiff continued to receive mental health treatment at the Miami County Mental Health Center during the period March 8, 2006, through October 6, 2006. (Tr. 606-34). On October 6, 2006, Ms. Zunke and Dr. Nims reported that Plaintiff's mental abilities for performing mental abilities critical for performing unskilled work were unlimited to limited but satisfactory to limited and unsatisfactory to none, that he had made some improvements in the last 3-4 months, that he now had temporary custody of his teenage daughter which kept him active with her schooling and discipline, he seemed to be seeing better without as much difficulty, did not complain of back pain as much, and that he still got very depressed and suicidal if he and his girlfriend had a serious argument. *Id.*

The mental health medical advisor (MA) testified at the hering that the evidence indicated that Plaintiff as of 2006, there were significant objective findings for many severe limitations that would preclude work based on the nueropsychological testing, that there was evidence that earlier than 2005 he initiated treatment but there were a lot of no-shows and cancellations, in terms of functionally equaling, there is a combination of listings 12.04 and 12.08. (Tr. 764-782). The MA testified further that the record established functional equality in March, 2006, that the problem with having equality before then is the lack of consistency, the evidence shows that he started treatment in 2002, that through the 2003, time period he was making a great deal of progress, that in August, 2003 his eyesight got worse and became a factor during that period, that there were some contradictory opinions put forth by the treating sources. *Id.*

In his Statement of Specific Errors, Plaintiff alleges that the Commissioner erred by

failing to give the appropriate weight to his mental health care providers' opinions, by failing to properly consider his limited vision, and by failing to consider his need for a cane to ambulate. (Doc. 8).

The question is, of course, whether Plaintiff became disabled prior to March 26, 2006, the date Judge McNichols determined him to be disabled.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only

14

appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

In determining that Plaintiff was not disabled prior to March 21, 2006, Judge McNichols essentially noted that Plaintiff's treatment notes from the Miami County Mental Health facility, including Ms. Zunke's reports, were centered primarily on Plaintiff's alleged exertional impairments, that Ms. Zunke's and Dr. Mahajan's opinions were not supported by those treatment notes, and that they were inconsistent with the examining and reviewing mental health specialists' reports and opinions. *See* Tr 28-30.

Although Ms. Zunke and Dr. Mahajan, as well as Dr. Nims, opined that Plaintiff was essentially disabled, those opinions are based on considerations outside the mental health care providers' area of expertise, and inconsistent with other evidence of record . For example, on May 27, 2004, Ms. Zunke and Dr. Mahajan based their opinion, at least in part, on Plaintiff's subjective complaints related to his alleged physical impairments. In addition, Dr. Nims noted on November 29, 2004, that Plaintiff had not been at the treatment facility for a number of months, had many, many health concerns, described himself as being unhealthy in general, that he was doing reasonably well on Lexapro, and that his primary concerns were related to his many health issues rather than

any emotional problems. (Tr. 428). Further, examining psychologist Dr. Boerger reported that Plaintiff was, at worst, moderately impaired and the MA essentially testified that the record did not support a finding that Plaintiff was disabled prior to March, 2006. Under these facts, the Commissioner did not err by failing to give controlling or even great weight to the opinions of Plaintiff's mental health care providers' opinions.

Plaintiff argues next that the Commissioner erred by failing to properly consider his vision impairment which is supported by his use of a white cane, dark glasses, and books on tape.

In questioning the medical necessity for Plaintiff's use of the visual aids noted above, Judge McNichols noted that in spite of undergoing considerable testing, his visual complaints had not been documented. (Tr. 25). In addition, Judge McNichols noted that Dr. Nims reported that although Plaintiff stated that he had very limited vision and used the cane and dark glasses, he observed Plaintiff getting into a car and drive away. *Id.*

This Court cannot say that Judge McNichols erred in his evaluation of the evidence with respect to any alleged vision impairment. First, as noted above, Plaintiff has indeed seen several vision experts and had undergone numerous objective testing. Although the record is clear that Plaintiff had a vision disturbance that is apparently corrected with the use of lenses, the medical tests results have essentially been negative. In addition, the vision experts who have examined Plaintiff have been unable to identify a cause of his alleged "blindness". Moreover, as Judge McNichols noted, on November 29, 2004, Dr. Nims noted that "[W]hen [Plaintiff] left the clinic he got into a car and drove off. This was particularly noted because of his wearing dark glasses, walking with a blind person's cane and his self-statements that he cannot see at all peripherally and his vision is extremely blurred and limited." (Tr. 428). Finally, as noted above, Plaintiff's MMPI

16

results suggested probable strong exaggeration of symptoms.

Plaintiff argues next that the Commissioner erred by failing to take into consideration his need to use a cane for ambulating. However, there is no indication in the record that any of Plaintiff's treating physicians have recommended that he use a cane and Dr. Danopulos specifically noted that Plaintiff did not need to use a cane for normal ambulation. (Tr. 492). Accordingly, the Commissioner did not err in this regard.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled prior to March 26, 2006, and therefore not entitled to benefits under the Act before that date be affirmed.

December 17, 2007.

                         *s/ Michael R. Merz*
                       Chief United States Magistrate Judge

NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).